UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:21-cr-00156 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| Gabriel PULLIAM and Julian SCOTT. | ) | |
| | ) | |
| | ) | JUNE 9, 2025 |

**MEMORANDUM OF DECISION**
**RE: MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR NEW TRIAL (ECF Nos. 887, 1079, 1080, 1093)**

Kari A. Dooley, United States District Judge:

Following a jury trial, Defendants Gabriel Pulliam ("Pulliam") and Julian Scott ("Scott") (collectively "Defendants") were both found guilty of: racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count One); violent crime (murder) in aid of racketeering ("VCAR murder") in violation of 18 U.S.C. §§ 1959(a)(1) and 2 and Conn. Gen. Stat. §§ 53a-54a and 53a-8a (Count Sixteen); causing death through the use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1) and 2 (Count Seventeen); violent crime (attempted murder and assault with a dangerous weapon) in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and 2, and Conn. Gen. Stat. §§ 53a-54a, 53a-59(a)(5), 53a-49, and 53a-8(a) (Count Eighteen); and carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii), and 2 (Count Nineteen).

In addition, Pulliam was found guilty of conspiracy to possess with intent to distribute and distribution of 100 grams or more of heroin or 40 grams or more of fentanyl, in violation of 21 U.S.C. § 846 (Count Twenty-Six); and possession with intent to distribute and distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) (Count Twenty-Seven).

Further, Scott was found guilty of two additional counts of attempted murder and assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and (2) (Counts Fourteen and Twenty-Two); and two additional counts of carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii) and 2 (Counts Fifteen and Twenty-Three).

Pending before the Court are Pulliam and Scott's post-trial Motions for Judgment of Acquittal and Motions for a New Trial, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.

**Procedural History**

On September 14, 2021, a federal grand jury returned a thirty-six count Indictment against sixteen defendants, including Pulliam and Scott, for conduct related to the activities of the street gang "960" in Waterbury, Connecticut. Defendants were charged in the following counts:

Pulliam and Scott:

- Count One, racketeering conspiracy in violation of 18 U.S.C. § 1962(d);

- Count Sixteen, VCAR murder in violation of 18 U.S.C. §§ 1959(a)(1) and 2 and Conn. Gen. Stat. §§ 53a-54a and 53a-8a, for the death of F. Guzman on October 11, 2018;

- Count Seventeen, causing death through the use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1) and 2, for the death of F. Guzman on October 11, 2018;

- Count Eighteen, attempted murder and assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and 2, and Conn.

> Gen. Stat. §§ 53a-54a, 53a-59(a)(5), 53a-49, and 53a-8(a), for the shooting of D. Mazon on October 11, 2018; and
>
> - Count Nineteen, carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii), and 2, for the shooting of D. Mazon on October 11, 2018.

Pulliam:

> - Count Twenty-Six, conspiracy to possess with intent to distribute and distribution of 100 grams or more of heroin or 40 grams or more of fentanyl from approximately June 2018 to February 2020, in violation of 21 U.S.C. § 846; and
>
> - Count Twenty-Seven, possession with intent to distribute and distribution of heroin on or about August 16, 2018, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2.

Scott:

> - Count Fourteen, attempted murder and assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and (2), for the shooting of A. Rosado on or about October 6, 2018;
>
> - Count Fifteen, carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii) and 2, for the shooting of A. Rosado on or about October 6, 2018;
>
> - Count Twenty-Two, attempted murder and assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and (2) for the shooting of Marquise Alcime and Jermaine Smith, Jr. on or about November 18, 2018; and

- Count Twenty-Three, carrying and using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), (iii) and 2, for the shooting of Marquise Alcime and Jermaine Smith, Jr. on or about November 18, 2018.

Jury selection was held on April 2, 2024. The jury heard evidence over the course of nineteen days, commencing on April 11, 2024, and on May 10, 2024, returned guilty verdicts as to all Counts against both Pulliam and Scott.

Pulliam and Scott orally moved for Judgment of Acquittal on May 1, 2024. *See* ECF No. 887. Pulliam and Scott then timely filed the written motions and memoranda in support of their motions. *See* ECF No. 1093 (Pulliam Mot.), ECF No. 1093-1 (Pulliam Mem.); ECF No. 1079 (Scott Rule 29 Mot.); ECF No. 1080 (Scott Rule 33 Mot.); ECF No. 1079-1 (Scott Mem.).

The Government filed oppositions to Scott and Pulliam's Motions for Judgment of Acquittal and Motions for New Trial on October 1, 2024 and December 2, 2024, respectively. *See* ECF No. 1104 (Gov. Scott Opp.); ECF No. 1132 (Gov. Pulliam Opp.). Pulliam filed a reply brief in further support of his post-trial motions on January 6, 2025. ECF No. 1145 (Pulliam Reply).[1]

**Standard of Review—Motion for Judgment of Acquittal**

"Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. A defendant who challenges the sufficiency of the evidence to support his conviction bears a heavy burden. Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the

---

[1] Defendant Pulliam does not challenge his convictions on Count Twenty-Six – conspiracy to distribute and possess with intent to distribute 40 grams or more of fentanyl; or Count Twenty-Seven – possession with intent to distribute and distribution of heroin.

4

Government's favor, but the jury verdict must be upheld if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (cleaned up).

When evaluating the sufficiency of the evidence, courts must "bear in mind that the jury's verdict may rest entirely on circumstantial evidence." *Id*. "When making a case based on circumstantial evidence, the government need not 'exclude every reasonable hypothesis other than that of guilt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *Holland v. United States*, 348 U.S. 121, 139 (1954)). Moreover, "it is the task of the jury, not the court, to choose among competing inferences." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). Rule 29 does not provide the trial court with an opportunity to "substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984); *accord United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016). Thus, "the court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Guadagna*, 183 F.3d at 130 (citation and internal quotation marks omitted).

**Standard of Review—Motion for a New Trial**

Rule 33 provides that the district court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). "In evaluating a Rule 33 motion, the

court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). "In other words, there must be a real concern that an innocent person may have been convicted" for the ordering of a new trial to be appropriate. *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (cleaned up).

With these legal principles in mind, the Court turns to the merits of Defendants' motions. In doing so, the Court will discuss the evidence at trial as necessary to address the issues raised by Defendants.

**Discussion**

Defendants Pulliam and Scott advance a number of distinct challenges to the sufficiency of the Government's evidence. The Court addresses each in turn, beginning with the arguments advanced by both.

Defendants, as may be applicable to them, challenge the sufficiency of the evidence as to Counts One, Fourteen, Fifteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty-Two, and Twenty-Three. Each of these Counts requires proof of the existence of a racketeering enterprise,[2] and the Defendant's participation therein. *See* Jury Instructions, ECF No. 910 at Section IV (Charged Offenses). Pulliam and Scott assert that there was insufficient evidence to establish that the 960 street gang was a racketeering enterprise or, even if it was, their participation therein. Both

---

[2] The Government correctly asserts that it was not required to prove the existence of the enterprise in the RICO Conspiracy count (Count One). *See* Gov. Pulliam Opp. at 9. However, insofar as the evidence, as discussed herein, was overwhelming that 960 was such an enterprise and did, in fact, exist, the Court does not analyze the sufficiency of the evidence under the less stringent standards applicable to RICO Conspiracy charges. Indeed, as the Court instructed the jury (an instruction not challenged), the existence of the RICO enterprise is perhaps the most probative evidence as to the existence of the RICO conspiracy. Jury Instructions, ECF No. 910 at 17.

Defendants are wrong. On these issues, the evidence was all but conclusive, and certainly nothing short of overwhelming.

The jury heard testimony from 43 witnesses over 19 days. They heard from law enforcement witnesses, lay witnesses, a cooperating witness who was a former 960 member, and an expert witness.[3] The jury received hundreds of exhibits, to include social media posts by Defendants and other 960 members; images; music videos; and notebooks.[4] From this evidence the jury could have easily concluded that 960 was a street gang operating out of, principally, the Long Hill Projects in Waterbury, Connecticut. The members of the 960 street gang included Pulliam, Scott, cooperating witness Jermaine Gilbert ("Gilbert"), Tahjay Love, Zaekwon McDaniel, Malik Bayon, Ezra Alves, Jaivaun McKnight, and others. The evidence was replete with images of the various members together, and often in the Long Hill Projects. The 960 gang had a brand of sorts, a logo which depicted the number 960 as being comprised of a gun with an extended magazine as well as a face mask. The gang also had a motto of sorts – "No face no case," which offers one explanation for the face mask in the logo. The branding appeared on clothing worn by members as well as in professionally made music videos. Indeed, one such video was titled "960 Story." The jury heard testimony about—and saw images of—hand signals which depicted membership in or allegiance to 960. 960 members had a handshake unique to members. Gilbert, a former member of 960, described the (concededly loose) structure of the gang; and

---

[3] The Court has not, herein, cited to specific testimony or exhibits in support of many of the factual findings the jury could have reasonably made. The Court does however, as deemed appropriate, cite testimony or exhibits throughout this decision. By citing to specific evidence in the record, the Court does not suggest that the evidence cited is the only evidence supporting the jury's conclusion on a particular allegation. Nor should the Court's decision to not cite specific testimony or exhibits with respect to other factual findings be construed as a suggestion that the evidence was lacking in any fashion. To the contrary, the evidence as to many of the allegations was so voluminous that including citations to same was deemed an unnecessary exercise for purposes of this decision.

[4] The trial also included extensive forensic evidence from multiple crime scenes as well as expert forensic testimony not detailed at this juncture in discussing the question of whether 960 was a racketeering enterprise.

identified various members and the roles they played in the activities of the gang, *i.e.*, who sold drugs or who was a "shooter." He described the gang's narcotics trafficking; access to and regular use of firearms, as well as the ongoing conflict with rival street gangs; the efforts to harm opposition gang members; and multiple acts of violence committed by himself and others in the name of, and to promote, 960 as a gang to be feared.

The jury heard testimony from multiple witnesses, to include cooperating witness Gilbert, that 960 had rivals. One such rival was a gang known as "ATM," which was centered in the Brooklyn section of Waterbury, to include the intersection of Bank Street and Porter Street. Multiple acts of violence committed by 960 members about which the jury heard evidence involved shootings directed at ATM members.[5] Another rival gang was the "Ave Boys," which was centered in the area where Walnut Avenue intersects with Walnut Street. Again, multiple acts of violence by 960 members about which the jury heard evidence were directed at the Ave Boys.[6]

The jury also heard testimony regarding the extensive drug dealing by multiple members of 960, to include Defendant Pulliam. The jury heard evidence from a former customer of Pulliam and others that there was a common "drug phone" used by more than one 960 member. The jury heard prison calls from Pulliam giving others instruction regarding drugs and money that were in his vehicle. *See e.g.*, Gov. Exs. 1021A, 1022A, 1023A. The jury watched the surveillance video of an undercover purchase of narcotics from Ezra and Ahmed Alves, Gov. Ex. 1206, and heard testimony from the undercover officer. The jury heard about the execution of a search warrant at 669 Waterville Street at which a stash of narcotics as well as a virtual arsenal of weapons was

---

[5] The October 31, 2017 shooting of Juwan Butler; the shooting of A. Rosado on October 6, 2018; the shooting of Jermaine Smith, Sr. on December 29, 2017; and the shootings of Jermaine Smith, Jr. and Marquis Alcime on November 18, 2018 all occurred at or in the very near vicinity of the corner of Bank St. and Porter St. In addition, Clarence Lewis and Antonio Santos, both murdered, were members of ATM.

[6] These include: the shooting of Hector Morales on November 1, 2018; and the murder of F. Guzman and shooting of D. Mazon on October 11, 2018.

8

located. Present at the time of the search were Ezra Alves, Jaivaun McKnight and Malik Bayon, identified 960 gang members.

The jury was instructed, not challenged by either Defendant, that:

> An "enterprise" is a group of people informally or formally associated together for a common purpose of engaging in a course of conduct over a period of time. In addition to having a common purpose, the group must have an ongoing organization, either formal or informal, and it must have a core of personnel that functions as a continuing unit. A group of individuals who are associated in fact can constitute an enterprise.

Jury Instructions, ECF No. 910 at 15.

Defendant Scott argues that the Government did not "connect the dots" by establishing that the drug dealing, firearms possession, or acts of violence furthered "the group, as a whole." Scott Mem. at 4. He relies upon testimony by Gilbert that the members were not required to pool the proceeds from narcotics trafficking, and that the narcotics trafficking occurred in various locations throughout the city and was not limited to the Long Hill Projects. *See id.* Scott further argues that 960 had no bylaws; regular meetings; dues; or organizational charts. *Id.* Thus, he posits, 960 was nothing more than a group of neighborhood friends who grew up together. *Id.* Pulliam advances the same arguments and further avers that: "[t]here was no evidence at trial that Mr. Pulliam and his friends operated 960 as a continuous unit to engage in racketeering activity." Pulliam Mem. at 8. Defendants advanced these arguments at trial and the jury rejected them. And such a narrow and myopic view of the evidence cannot withstand scrutiny. As detailed above, the evidence that 960 operated as a racketeering enterprise was overwhelming. The narcotics trafficking was prolific and the acts of violence took place *in the context of a gang war* between 960, ATM, and the Ave Boys.

Alternatively, Defendants assert that even if 960 was an enterprise, the evidence was insufficient to establish their membership or participation therein. Again, Defendants are wrong.

9

In addition to the evidence detailed above, Gilbert identified both Scott and Pulliam as members of 960.  Transcript of Trial Testimony of Jermaine Gilbert ("Gilbert Trial Tr."), ECF No. 923, at 31, 37.  Indeed, Gilbert referred to Pulliam as the "leader" – "[h]e the one that started it. And, basically, like how a basketball team got a captain, he the captain." *Id.*  Pulliam had a tattoo of "1920," the precursor gang to 960, on his wrist.  *Id.* at 25.  When asked what Pulliam did on behalf of 960, Gilbert testified: "[s]old drugs, committed violence." *Id.* at 31.  Pulliam also appeared in some of the 960 produced music videos.  And as further discussed below, Pulliam was identified as one of the shooters in the violence that unfurled on October 11, 2018 as part of an escalating gang war.

Gilbert testified that Scott was a "[s]hooter and a rapper." *Id.* at 37.  The jury saw a video made by Scott called "Savage Part 1," in which Scott appears with other identified 960 members and in which Scott does the 960 handshake and demonstrates the 960 hand signal.  And the notebook seized from Scott's prison cell is replete with references, *by name*, to other 960 members, to include Jeez Bryant, whose murder in the Fall of 2018 set off a spate of violence against rival gang members.

In light of all of the foregoing, Defendants' Rule 29 Motions for Judgment of Acquittal on these bases are DENIED.

### *Defendant Scott's Motion – Counts 14, 16, 17, 18, and 22*

Defendant Scott challenges the sufficiency of the evidence as to each of these crimes of violence on the ground that the proof as to each relied upon the testimony of cooperating witness Gilbert.  Scott argues that Gilbert's credibility (and therefore, his testimony) was sufficiently undermined at trial, and that "this is one of those rare cases in which the court should exercise its inherent powers and overrule the jury findings." *See* Scott Mem. at 8.  The Government refutes

10

this contention. The Court agrees with the Government. As discussed above, the Court does not sit as a thirteenth juror. Credibility determinations are uniquely the province of the jury. *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011). And the Court cannot conclude that no reasonable juror could have credited Gilbert's testimony. *See United States v. Williams-Bey*, No. 3:20-CR-00172 (MPS), 2023 WL 5286799, at *6 (D. Conn. Aug. 17, 2023) (collecting cases). First, Gilbert was on the witness stand for four days and was subjected to rigorous and exhaustive cross-examination. The inconsistencies now detailed by Defendant Scott were thoroughly highlighted during the cross-examination, as well as in closing arguments. Second, Gilbert's testimony included information as to his and other 960 members' involvement in other shootings which did not involve Scott, *i.e.*, the deaths of Clarence Lewis and Antonio Santos. His testimony as to these other events was corroborated, to varying extents, by other witnesses, surveillance video, shell casings, social media posts, ballistic experts, DNA experts, phone extractions, and phone records.[7] So too, discussed below, was his testimony regarding Scott's involvement in the shootings underlying each count of conviction.

### Counts 14 and 15 – The Shooting of A. Rosado.

Gilbert testified that he was riding in a stolen Hyundai with Dayquan Sinisterra (driver), Ezra Alves, and Scott. Gilbert Tr., ECF No. 924 at 123–24. He testified that only he and Scott fired from the vehicle, with Gilbert firing a .40 caliber handgun. *Id.* at 127–128. Although they were hoping to hit a rival gang member, he testified that a woman was hit. *Id.* Gilbert's testimony is corroborated by the evidence of record. Indeed, a woman was hit; two types of shell casings

---

[7] By way of example only, the number of different shell casings recovered from the scene of the shooting (indicating multiple firearms and by extension, multiple shooters) corroborated Gilbert's testimony as to the number of shooters present; his testimony that McDaniel was involved in the shooting death of Lewis was corroborated by the presence of McDaniel's DNA on a gun magazine found at the scene of the shooting; his testimony that McDaniel told him he had participated in the shooting of Jermaine Smith Sr. was corroborated by video images taken from McDaniel's cellphone moments before the shooting.

11

were recovered – including those from a .40 caliber; and surveillance video showed the Hyundai in which they were driving and appears to confirm Gilbert's testimony that he was firing over the roof of the vehicle.

### Counts 16, 17 and 18 – The Shooting of F. Guzman and D. Mazon

Gilbert testified that he was present for the shooting of F. Guzman and D. Mazon on October 11, 2018; and that he was driving his own car in which Pulliam was a passenger. Gilbert Tr., ECF No. 924 at 137–38. He testified that Sinisterra was driving a second car (the same Hyundai as was used in the A. Rosado shooting) in which Scott was a passenger. *Id.* at 144. Gilbert testified that as they drove through rival gang territory along Walnut Avenue, they thought they spotted a rival gang member whom they believed was responsible for the shooting death of Jeez Bryant. *Id.* at 143–45. Gilbert therefore turned off of Walnut Avenue and onto Vermont Street. *Id.* Shortly thereafter, Gilbert testified, Sinisterra pulled up behind him. *Id.* at 146. Scott then exited Sinisterra's vehicle, approached Gilbert's vehicle and inquired where Pulliam was. *Id.* at 146. Gilbert told him that Pulliam had already walked down to Walnut Avenue. *Id.* Scott followed. *Id.* The passengers in Gilbert's car began to get nervous with the passage of time. *Id.* at 148. Laderrick Jones called Pulliam to inquire as to the delay. *Id.* Pulliam told Jones it was about to happen. *Id.* Within moments, Gilbert heard gun shots. *Id.* at 149. Pulliam and Scott then returned to their respective vehicles and they drove off, with Gilbert in the lead. *Id.* at 149–50. They first drove to a commuter parking lot and thereafter to a McDonald's in Southington, where Pulliam paid for food. *Id.* at 151, 154–56. Gilbert described the mood as celebratory. *Id.* at 155–56. Eventually, the group returned to Waterbury and Gilbert drove Scott home to the Long Hill Projects along with three other (much younger) participants. Gilbert Tr., ECF No. 925 at 6–7.

Multiple portions of this testimony were corroborated. Surveillance video from Walnut Avenue captures Gilbert's car as it passes the scene of the shooting, briefly braking and then turning onto Vermont Street. Gov. Ex. 704A. Surveillance video from Vermont Street shows Gilbert's car arriving, stopping, and an individual getting out of the car. *Id.* The same surveillance video shows a second car arriving soon after and stopping behind Gilbert. *Id.* Shadows on the footage appear to show a second individual getting out of the second car. *Id.* After a period of time, an individual is seen returning to Gilbert's car; jumping in the back seat; and then the car speeds off, with the rear sliding door still open. *See id.* The second car follows. *Id.* Although the individuals are not identifiable, the events unfolded as Gilbert testified.

Further, after Gilbert's car was seized and searched the following day, law enforcement recovered a phone that had been left in the back seat. The phone belonged to one of the younger participants who Gilbert had identified. Law enforcement recovered videos from the phone which had been taken in the early morning hours at a McDonald's where the group was listening to music and generally celebrating. Scott is in the video, as are several of the other participants identified by Gilbert, as well as the Hyundai and Gilbert's vehicle.

Surveillance video from the Long Hill Projects showed Gilbert's car at the projects dropping off four passengers, one of whom entered the building where Scott lives and from which earlier surveillance video showed Scott exiting when he was picked up by Gilbert. *See* Gov. Ex. 704A.

Gilbert's testimony as to who was present was also corroborated by DNA evidence. For example, Pulliam's DNA was found on a Gatorade bottle located in Gilbert's car; Ladderick Jones' DNA was found on a straw located in Gilbert's car; and D'Andre Burrus' DNA was found on a cigar in Gilbert's car. Gilbert had identified the occupants of his vehicle that night as himself;

Pulliam, Jones and Burrus. Moreover, law enforcement recovered two different shell casings from the scene of the shooting, evidence of two shooters. The .40 caliber shell casing was matched to the shell casing recovered at the scene of the A. Rosado shooting five days earlier. The .40 caliber gun Gilbert had used in the A. Rosado shooting is the same gun he testified had been given to Scott on the night of the F. Guzman and D. Mazon shootings.

### Counts Twenty-Two and Twenty-Three

As to the shootings of Jermaine Smith, Jr. and Marquis Alcime on November 18, 2018, Gilbert testified that he was with Sinisterra (driver) in a stolen Audi when Ezra Alves told them that a rival gang member, "Maino Zuu," was live streaming and disrespecting Jeez Bryant, then recently deceased. Gilbert Tr., ECF No. 925, at 48–51. Sinisterra and Gilbert then picked up Ezra Alves and Scott. *Id.* at 51. Gilbert assumed driving responsibilities and they drove to the Brooklyn section of Waterbury, *i.e.*, the corner of Bank Street and Porter Street. *Id.* at 52–53. At the suggestion of Ahmed Alves, they all left their cell phones with Ahmed Alves. *Id.* at 51–52. Gilbert testified that Sinisterra had two guns; Alves had a gun; and Scott had a gun. *Id.* at 54–55. As they drove through the corner of Bank Street and Porter Street, people in the Audi opened fire, to include Scott, who shot from the sunroof of the Audi. *Id.* at 55. After the shooting, with the help of Ahmed Alves, they got rid of the Audi. *Id.* at 55–56. Gilbert testified that Ahmed picked them up after they got rid of the Audi, in a green Infiniti. *Id.*

This testimony was corroborated by surveillance video which showed a dark SUV, consistent with the Audi (which was eventually located) and which revealed that it had an open sunroof with a T-Bar configuration. *See* Gov. Ex. 706A. The jury learned that three different types of shell casings were recovered at the scene – consistent with three shooters. One of the victims, Jermaine Smith, Jr., is known as "Maino Zuu." Sinisterra's DNA was found on the Audi

gear shifter, as well as on a .380 caliber firearm subsequently located and linked to one of the shell casings recovered at the scene. The jury also saw Ahmed Alves in a green Infiniti during an undercover narcotics purchase. Sinisterra's texts from that evening appeared to reference the shooting, and Scott's notebook included: "[w]e sent them shots, Maino Zuu runnin for his life."

So while Gilbert's testimony was critical to the Government's case, it did not stand alone. He was oft corroborated; he was subject to rigorous cross examination; and there is therefore no basis upon which this Court should upset the jury's verdict.

Defendant Scott also challenges the sufficiency of the evidence by offering competing inferences that could be drawn from the evidence, for example, that the presence of multiple shell casings could be the result of past shootings given the high crime nature of the location. Scott. Mem. at 9. Scott was free to make these arguments to the jury, and indeed, did so. But ultimately, it was for the jury to accept or reject those arguments.

Defendant Scott's Rule 29 Motion for Judgment of Acquittal is therefore DENIED.

***Pulliam's Motion – Counts 16, 17, 18, 19***

Defendant Pulliam challenges his conviction because each count of conviction required the Government to establish the predicate VCAR murder of F. Guzman or assault of D. Mazon. *See* Jury Instructions, ECF No. 910, at 22, 31–32, 36–37, 40. Pulliam argues that the evidence is insufficient to establish that he had a position in the racketeering enterprise or that the crime of violence at issue was committed in order to maintain or increase that position. As to the former argument, Pulliam relies upon the same argument advanced with respect to the existence of the racketeering enterprise and/or his membership therein. The Court has already rejected this argument.

15

As to the latter argument, Pulliam argues that the jury would have to resort to guesswork in order to find that he had the requisite intent to maintain or increase his position within the 960 enterprise. Pulliam Mem. at 9. The only evidence of intent, Pulliam posits, is the gang expert's generic testimony that criminal activity is undertaken because it will raise a gang member's standing in the gang, which he argues is wholly inadequate to meet the Government's burden.

The Government responds that the evidence established that the murder and assault on October 11, 2018 was retaliation against 960 rivals, particularly those believed to be involved in the murder of Jeez Bryant, and that it was Pulliam's suggestion that the group travel to the Walnut Avenue neighborhood in search of those responsible. The Court does not repeat the detailed testimony offered by Gilbert discussed above regarding the events of October 11, 2018. Gilbert also testified that after the shooting, Pulliam and Scott both stated they "saw someone drop." Gilbert Tr., ECF No. 924 at 152–53. Thereafter, Gilbert testified, the group went to McDonald's to celebrate the successful shooting and Pulliam provided the cash with which the food was purchased. *Id.* at 154–57. The videos from the McDonald's showed the celebration, which included disrespecting the rival gang, whose member the group erroneously believed they had shot.

The Court agrees with the Government. The evidence established that 960 members believed that rival gang member Hector Morales, known as "Hec," instructed "Little J." to shoot Jeez Bryant. Indeed, the jury saw surveillance video of Little J. walking toward the scene of the Bryant shooting moments before it occurred. *See* Gov. Exs. 503, 503A; Trial Testimony of Kyle Howles, ECF No. 920, at 116–122. Hec and Little J. were members of the "Ave Boys," a gang whose territory included the intersection of Walnut Avenue and Walnut Street. The jury heard

16

and saw ample evidence that avenging Bryant's death became a priority for the gang in the days and weeks following the murder.

Gilbert testified that he thought he saw "Hec" when driving down Walnut Avenue before turning onto Vermont Avenue. The jury also saw a photo of F. Guzman's boyfriend, who had placed the 911 call after the shooting, which revealed at least a passing resemblance to "Hec," likely enhanced by the low light and late hour.

The jury also heard testimony from Gilbert and viewed evidence that violence was glorified and even revered. Indeed, he testified that after his first shooting, McDaniel told Love that Gilbert was "ready to go out drillin'." Gilbert Tr., ECF No. 924 at 46–47. The threat of violence as seen on social media and through music videos demonstrated that violence begets fear and fear begets stature. Indeed, a common taunt of a rival gang member is that they were *not* as violent as they claimed to be. Further, the evidence supports the inference of Pulliam's intent because it appears his intention was achieved. In celebrating the October 11, 2018 shooting at McDonald's, which Pulliam financed, the participants were reveling in the violence committed by the shooters and thereby celebrating the shooters themselves—Pulliam and Scott.

Pulliam's Motion for Judgment of Acquittal is DENIED.

### *Scott's Motion for a New Trial*

In the alternative, Scott seeks a new trial, again premised, in part, on Gilbert's lack of credibility. Having already rejected this argument as it relates to the Rule 29 Motion, the Court similarly concludes that granting Scott a new trial is not necessary to avoid a miscarriage of justice on this basis.

Scott also challenges the Government's reliance on the composition notebook seized from Scott's prison cell. Without citation to any authority, Scott accuses the Government of pandering

17

to the jurors' bias against rap music and black people; argues a First Amendment violation in using Scott's "lyrical musings" against him; and asserts that the notebook should have been excluded under Rule 403. *See* Scott Mem. at 14–16.

The first argument has no foundation in this record and assumes an insidious societal bias without citation to any authority.[8] Scott's argument also ignores the significant evidence regarding the role of rap music in the 960 enterprise. As Gilbert testified, 960 rappers used rap music to let "the city know, like, what you doin." *See* Gilbert Tr., ECF No. 923 at 61. The rap was directed at rivals, as well as the community writ large. The 960 rappers, to include Scott, did not "cap rap," that is, lie in their rap lyrics. *See id.* at 62–63. If the lyrics were not real, no one would listen. *Id.* Gilbert also explained much of the words and phrases used. *Id.* at 57–60. Indeed, Gilbert walked the jury through "Savage Part 1" and "Night After Night," two rap videos in which Scott raps about gang violence. *Id.*

Further, the Court limited the Government's use of the composition notebook and permitted those entries that appeared to reference actual events, *i.e.*, the death of Jeez Bryant and the spate of violence that unfolded thereafter. For example, Scott's lyrics include: "[i]f I catch lil jay Ima take his soul. He shot Jeez broadday it's still free my bro." Exhibit 1013A.

### *Pulliam's Motion for a New Trial*

Pulliam seeks a new trial asserting that it would be a miscarriage of justice to permit the conviction to stand insofar as Gilbert's testimony was inconsistent with the evidence offered. In seeking a new trial, Pulliam offers competing inferences or conclusions, which he asserts are supported by the evidence. Many, if not all, of his arguments were presented to the jury. And as discussed above, Gilbert's testimony, while perhaps essential to the Government's case, did not

---

[8] Contrary to Scott's assertion, Hip-Hop/Rap is purportedly the most popular musical genre. *See* https://www.unchainedmusic.io/blog-posts/top-music-genres-in-order-the-most-popular-genres-worldwide.

stand alone. Perceived inconsistencies are not a basis upon which the Court would or should order a new trial.

Pulliam also seeks a new trial insofar as the Court denied his request for a *Daubert* hearing regarding the use of a ballistics expert. For the reasons previously articulated, the Court does not herein revisit the issues surrounding the request for a *Daubert* hearing or the challenge to the ballistic experts' testimony. *See* ECF Nos. 589, 814. Further, Pulliam could have, but did not, offer his own expert testimony to try to undermine the conclusions of the Government's experts.

Pulliam also seeks a new trial based upon the Court's instruction regarding the use of co-conspirator statements. The Court instructed the jury:

> You will recall that I have admitted into evidence against the defendants the declarations and statements of others because these declarations and statements were committed by persons who, the Government charges, were also confederates or co-conspirators of the defendants on trial. The reasonably foreseeable declarations and statements of any member of a conspiracy made in furtherance of the common purpose of the conspiracy, are deemed, under the law, to be those of all of the members. It is the jury's function to determine whether the evidence, including the co-conspirators' declarations and statements, is credible and convincing. The burden of proving beyond a reasonable doubt that a conspiracy existed and that the defendants were members of that conspiracy remains with the government.

*See* Jury Instructions, ECF No. 910 at 64.

This instruction appears in Sand's Model Jury Instructions. Pulliam argues that this instruction essentially opened the door to *Pinkerton* liability for acts of violence he did not commit. The Court disagrees. The instruction was about the jury's ability to consider statements by co-conspirators, and explained the rationale for the rule. The jury instruction as to the government's burden of proof with respect to the shootings of F. Guzman and D. Mazon were explicit. This instruction did not, as posited, suggest to the jury that, notwithstanding the Court's instructions, Pulliam could be found guilty of the VCAR murder *with which he was charged*, if the jury

19

concluded that a different 960 member committed a VCAR murder with which Pulliam *was not charged*. Further, the instruction is an accurate statement of the law without which the jury may have been unclear or even misled as to the extent to which evidence of 960 members' statements could be considered during deliberations.

**Conclusion**

The Motions for Judgment of Acquittal, or in the alternative, for a New Trial, are **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 9th day of June 2025.

                                            /s/ Kari A. Dooley
                                            KARI A. DOOLEY
                                            UNITED STATES DISTRICT JUDGE